Our fourth case this morning is Aguero v. University of Illinois. I'm just going to give the courtroom a minute to clear out. Mr. Sade Good morning, Your Honors. May it please the Court. My name is Sam Sade and I'm an attorney for appellant in this case, Ms. Aguero. This is an appeal from the decision of the District Court to grant defense motion for summary judgment and plaintiff's Title VII claims. The plaintiff has raised two arguments in her appeal. The first one has to do with the use of suspicious timing to prove discrimination. Plaintiff in this case testified to a variety of facts and events that occurred in close proximity to one another. And together, they raised serious suspicion regarding the timing of when she was subjected to adverse action and negative evaluations and the eventual non-renewal of her contract. And in this decision to dismiss appellant's claims, the District Court acknowledged that appellant could use suspicious timing as a method to prove discrimination. But then it went on to hold that the suspicious timing had to relate specifically to a discriminatory act. Are you talking about the evaluations? That would be the evaluations, the negative evaluations, and then subsequently the non-renewal of her contract. Those were the adverse actions.  All of these events that the appellant has alleged occurred over the course of a few months. Her complaints, the way that her complaints regarding certain ethical issues that were happening at the university and then her discrimination claims, all those complaints and then the various adverse actions she was subjected to all occurred within the course of six or seven months, from September going on to the following year. Am I right that Winter and Peter, who wrote the evaluation, didn't know about her complaints at that point? At the time they did her first evaluation, that was negative? There are statements on the record that state that Peter and Winter, who I believe are the two supervisors, claimed that they didn't know about various complaints. The argument that we have is that Ms. Elliot, Susan Elliot, who was, and everybody was under her from a hierarchy standpoint, she had a conversation with McNeely, who was with the Office of Ethics. And there was, in the same conversation where McNeely brought up concerns that Ms. Aguero had raised, in the same conversation there was a conversation about Ms. Aguero's performance. And we believe there are enough facts where Ms. Elliot was led to read between the lines that this is the person that, this is how we found out. But she's not the one who wrote the performance evaluation. No, but she was the person who was, that Peter and Winter reported to. So you're saying that there are enough facts to assume that she told Winter and Peter? We believe at least there are enough facts that should be presented to a jury. Do you have any evidence of that? Do you have any evidence that she told those two? It's circumstantial evidence, Your Honor. It's just based on the timing of events and the fact that, and we'll get to evaluations that Ms. Aguero received. But the fact that she was receiving only positive feedback from her supervisors, including these supervisors, not in different positions, but these specific supervisors. And then she starts to make complaints, and then suddenly everything goes south. Well, counsel, let me ask you this, too. I mean, the timing, let's just put aside for a minute who knew what. But the timing argument that you're making essentially seems to suggest that she was being retaliated against because she raised these ethical concerns about her bosses. That's not race or gender discrimination. Being retaliated against because your bosses don't like that you're raising concerns about their ethics. There is a subtle difference, Your Honor, and I'll try to explain that. It is true that normally in cases like this where a plaintiff claims that they made a complaint, say, about discrimination, and then a few months later something happened to them, that's a classic retaliation claim under Title VII. In this case, the appellant has alleged that the way that the complaints were handled by McNeely and then Ms. Doran, I believe, with a DOA, themselves were discriminatory acts. And then the actions that followed, the adverse action, is the one that we're using to say that this is how we're using suspicious timing. The way that the complaints were handled is evidence that there was some kind of a bias going on against Ms. Aguero based on the protective groups she was a member of. What are the comparators? There are three individual comparators, and they're Caucasian females. But kind of differently situated, though, right? There was really nobody who had – there are always subtle differences. But as the Circuit Court and other cases in other circuits in the Supreme Court have established, we're not looking for clones here. And in this case, it was really impossible to find somebody with the exact same title. But these are the same individuals, all under Ms. Elliott, all within the College of Business. This is as close as an appellant was able to get in terms of finding comparators that could match. What is the timing, the foundation of the timing that you're complaining about? Is it in – what is his name, Mahoney? We're reporting about Mahoney. Is that the time factor that you're talking about? What's timing? Your Honor, most of the events that happen that relate to the appeal, they start from September. So let's say from – it was September of 2015, I believe. She reported on Mahoney in August, right? Correct. And you're saying the other things with the negative reports started in September? So the complaint regarding Mahoney is not part of what we're claiming is part of this sequence of events. That happened a while back. Okay, so that's not part of the timing factor. Correct. The timing starts when Mr. Aguero starts to raise – so the first complaint would be on September 14, 2015, I believe. Sorry if I may just look at the exact year here. Yeah, 2014. Yes, 2015. When? When she – 2015, September of 2015. So on September 14, she – So that's a year later than Mahoney. Correct. That's when she raises a complaint. She raises concerns with the Office of Ethics and Compliance on September 14 regarding how certain accounts were being handled. And just 10 days later, she receives a negative evaluation. And within that window, we have a situation where Ms. McNeely, who was the person who received the ethics complaint, had a conversation on the phone with Ms. Elliott. And within the same conversation, there is a discussion about appellant's performance. And so we're talking in some of these events, and then there are additional complaints where later in September, basically the day after September 24 and September 25, appellant had another conversation with Ms. McNeely, saying that she felt like she was being harassed because of the complaint. Then there were additional complaints. One was on October 12, where she went to the ODEA to complain about discrimination. So again, we're talking about all these complaints happen within weeks, sometimes within days of each other. And at the same time, this is when she's starting to receive negative evaluations. After 15 years at the university, suddenly her performance is deemed insufficient and in complete inconsistency with how she was treated before. You said she had compliments before that from a couple of people. Is that right? That's correct, Your Honor. You are well into your rebuttal time, counsel. Do you want to stop and save any? Sure, Your Honor. I'll just stop. Mr. Kolb. Thank you, Your Honor. Counsel, may it please the court. My name is Nathan Kolb. I'm here representing the Board of Trustees at the University of Illinois. The district court in this case properly granted summary judgment because Ms. Aguero has failed to introduce any evidence from which a jury can reasonably infer that she was discriminated against on the basis of her race, her gender, or her national origin. Instead, the evidence shows that Ms. Aguero received a notice of non-renewal because she was not meeting her employer's legitimate employment expectations. To address this suspicious timing issue that plaintiff's counsel brought up, there is no evidence that the timing here was in fact suspicious. Instead, what Ms. Aguero wants is for the court to assume that because she subjectively believes she was discriminated against, look through that lens and analyze this evidence to find it suspicious. The evidence simply is not there. The negative performance evaluation, the initial one, was in September of 2015. Approximately 10 days before that, she made this ethics complaint. But there is evidence in the record of draft performance reviews, of emails, of deposition testimony from Ms. Winter and Mr. Peacher that she was not meeting their expectations well before that. There is a draft performance evaluation from June 2015 that echoes the same language and the same issues that they were having that is in that published one, the one that she received in September 2015. In addition, Your Honor is correct, Ms. Winter and Mr. Peacher testified that they never knew, even up until the filing of this lawsuit, that Ms. Aguero had gone to the ethics office or to ODEA. They could not have retaliated or discriminated against her because she filed those claims if they were not aware of them. In addition, this conversation between Ms. McNeely and Susan Elliott, Your Honor is correct that Susan Elliott is the overall supervisor. She is not a decision maker. She did not draft the performance review. They had a conversation. Ms. McNeely never disclosed Ms. Aguero's name, even to Ms. Elliott. In addition, Ms. Aguero's performance did arise during the conversation she had with some of the College of Business personnel. The reason it arose is because Ms. McNeely was investigating this ethics complaint and basically asked the question, well, how was this not caught earlier? That is when Roger Owens and Jay Young said that they had been working and trying to bring Ms. Aguero up to speed on some of the accounting procedures, that she hadn't been getting it, and that was all the discussion that they had about her performance. Can you talk about the comparators and how they are different or similar to Ms. Aguero? Yes, Your Honor. She has introduced evidence of these three comparators. They all work in different offices of the College of Business. They work for different supervisors. They perform different job duties. They have different pay scale, different educational backgrounds. Even one is a supervisor of another one. Most importantly, though, they are not similarly situated and are not useful comparators simply because they did not engage in any similar conduct or were not subjected to a similar set of circumstances. For instance, the plaintiff has introduced no evidence that they ever received a negative performance evaluation. She has introduced no evidence that they ever made an ethics complaint or a complaint to ODEA. Without a similar set of circumstances, it's impossible to compare how they were treated versus how Ms. Aguero was treated in that event. In addition, Ms. Aguero has not introduced any evidence to show that she was meeting her employer's legitimate expectations, and that is part of her burden in this case. The evidence is plain that there were multiple negative performance evaluations, both before and after her ethics complaint, the draft performance evaluation, and the emails that were exchanged criticizing her performance. Are those written? There is a written draft performance evaluation contained in an email. It is in the record, and its language echoes the language that eventually made it into the first performance evaluation of September 2015. I wonder if these initial ones are behind the scenes, or are they disclosed to her as well? This was behind the scenes, but Ms. Winter and Mr. Peacher, they both testified that they had conversations with Ms. Aguero and tried to tell her the things that they expected her to do better. They gave her feedback about her performance in real time. She should have been well aware that they were not pleased with how she was performing, even before the initial performance evaluation. It's worth reiterating that this initial performance evaluation was an annual evaluation. She began work for the Center in October of 2014, so this late September 2015 evaluation was her first annual review. This is not a situation where this came up out of nowhere. It was scheduled long before, and that's why they were working on it back in June. So that's the first time, and there's not a history of getting a good one? There is not in this job, Your Honor. Ms. Aguero does cite to having received positive performance reviews from 2001 to 2008, but those were when she was in a different job, working for a different supervisor, and performing different duties. She then also relies on these isolated instances of praise, I think, where she was thanked for her work putting together a lecture. And that's not really the inquiry. What the court needs to look at is whether or not she was meeting her employer's expectations at the time of the adverse employment action. So even if she had been meeting her employer's expectations back when she first started, all that matters is whether she was meeting those expectations at the time of the adverse action. And this string of performance reviews shows that she was not. In addition, even if that did create a fact question, these isolated instances of praise, that doesn't end the analysis. Because under McDonnell-Douglas, all that that does is shifts the burden over to the defendants to put forth a legitimate non-discriminatory reason for her non-renewal. And the university has done that. We have cited her performance. The burden then would shift back to the plaintiff to show that that reason is mere pretext. And she has introduced no evidence to show that that reason was pretextual. And it's important to remember that pretext in this context means something similar to dishonesty. Winter and Peacher have to have not believed their own reason. It is not simply that they were subjectively incorrect about her meeting her performance expectations. This court has said multiple times that it will not sit as some sort of super personnel department and second guess the employer's decision making. And it should not do so here. At the end of the day, what Ms. Aguero is asking this court to do is find that based purely on her own allegations, purely on her own subjective belief, that she was discriminated against and that that is sufficient to get past summary judgment. That's not the law. That should not be the law. Instead, she must introduce evidence from which that inference can be drawn. And her failure to do so here means that the court's grant of summary judgment was correct and we ask you to affirm. Unless the court has any questions. Thank you, counsel. I'll give you a minute for rebuttal, Mr. Sidi. Thank you, Andrew, for the extra 30 seconds. Just wanted to make some quick points regarding these evaluations. The appellant has presented sufficient evidence based on which a reasonable jury could determine that the adverse actions were pretextual. First of all, the evaluations that she received deemed her insufficient in all areas. And the fact that she was not even found to have had sufficient performance in even a single area is further questionable because it is in such contrast to the kinds of evaluations she had received. Again, in previous positions, but also the kind of verbal feedback she received. Second, she presented detailed responses to these evaluations. And the supervisors never engaged with her to try to see if there are ways that she could address those concerns. And the fact that they did not even respond to those detailed responses is further evidence that they had predetermined that she had failed and she was going to be out the door. So the evaluations were not really, they were kind of pointless. They were prelude to something that was already decided. And finally, I would just like to say that the same people who evaluated her were the same individuals about whom she had complained. And that brings their credibility into serious question. At least we think there is enough circumstantial evidence that the credibility issue should be left for the jury, not for the judge to decide. Thank you, counsel. The case is taken under advisement.